UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                                          :

FARAM 1957 S.p.A.,                     :
                                          :

                       Plaintiff,    :

                                          :

           - against -             :

                                          :

                                          :

FARAM HOLDING AND FURNITURE,   :
INC., DOMENICO GUZZARDI,       :
FRANCESCO INGALLINERA and LETIZIA :
INGALLINERA                        :

                                          :

                     Defendants. :

                                          :
----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _3/19/2018_

16-CV-2430 (VSB)

**OPINION & ORDER**

<u>Appearances</u>:

Jessica Lau
Lynch Daskal Emery LLP
New York, New York

Mary Christine Carty
Mathew Brehan West
Schnader Harrison Segal & Lewis LLP
New York, New York
*Counsel for Plaintiff*

Bradley Adam Fishman
Craig Matthew Flanders
Wuersch & Gering LLP
New York, New York

Francesco Amalio Di Pietro
Matthew Handler
Jason Canales
Moses & Singer LLP
New York, New York
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

Plaintiff Faram 1957 S.p.A. ("Faram 1957") initiated this action on April 1, 2016 alleging that Defendants Faram Holding and Furniture, Inc. ("Faram Holding"), as well as Domenico Guzzardi, Francesco Ingallinera, and Letizia Ingallinera (collectively, the "Faram Holding Individuals," and together with Faram Holding, "Defendants"), infringed its trademarks in violation of the Lanham Act, 15 U.S.C. §§ 1114–17, 1125(a), the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1), and New York General Business Law, N.Y. Gen. Bus. Law § 349.

Before me are two motions for partial summary judgment. The motions request summary judgment with respect to the ownership of trademarks that Faram S.p.A. ("Old Faram") owned and had registered with the United States Patent and Trademark Office ("USPTO") prior to its bankruptcy (the "Faram Trademarks"). Defendants move for summary judgment with respect to Faram Holding's rights to use the Faram Trademarks under several agreements entered into by Old Faram. Plaintiff moves for summary judgment with respect to the validity of the agreements as well as Faram 1957's ownership of the Faram Trademarks. For the following reasons, Defendants' motion for partial summary judgment is DENIED in its entirety, and Plaintiff's motion for summary judgment is DENIED in part and GRANTED solely in connection with the use of the Faram Trademarks pursuant to the 2012 Distributorship Agreement.

## I.    **Background**[1]

### A.    *Old Faram*

Old Faram was an Italian furniture and office design company founded in 1957.  (Compl. ¶ 11.)[2]  Old Faram controlled Faram UK Ltd. ("Faram UK"), which in turn owned 90% of the shares in a company called Faram US Inc. ("Faram US").  (Defs.' 56.1 ¶¶ 4–5; Pl.'s Reply 56.1 ¶¶ 4–5.)[3]  The other 10% of the Faram US shares were held by Nigel Long, the president of Faram US until 2012.  (Pl.'s 56.1 ¶ 32; Defs.' 56.1 ¶ 4.)[4]

Old Faram conducted business it had in the United States through Faram US.  (Defs.' 56.1 ¶ 6; Pl.'s Reply 56.1 ¶ 6.)  According to Defendants, Old Faram conducted its business in the United States pursuant to a Distributorship Agreement between Old Faram and Faram US (the "2012 Distributorship Agreement").  (*See* Defs.' 56.1 ¶ 20.)  Although there are signature blocks for both Old Faram and Faram US, the 2012 Distributorship Agreement was only signed by Old Faram and is only dated with the year, 2012.[5]  (Guzzardi Aff. Ex. 2; Long Decl. Ex. A.)[6] The 2012 Distributorship Agreement states that Faram US is the "exclusive, authorized distributor for the sale of [Old Faram products] in North America" and grants Faram US the "exclusive . . . right to market and distribute [Old Faram products] anywhere in [North America]

---

[1] The facts in this background section are undisputed unless otherwise noted.

[2] "Compl." refers to Plaintiff's complaint, filed April 1, 2016 ("Complaint").  (Doc. 1.)

[3] "Defs.' 56.1" refers to Defendants' 56.1 Statement of Undisputed Material Facts, filed February 3, 2017. (Doc. 59.)  "Pl.'s Reply 56.1" refers to Plaintiff's Response to Defendants' 56.1 Statement of Undisputed Material Facts, filed February 24, 2017.  (Doc. 75.)

[4] "Pl.'s 56.1" refers to Plaintiff's 56.1 Statement of Undisputed Material Facts, filed February 21, 2017.  (Doc. 72.)

[5] Although there appears to be space for indicating the day and month, those spaces appear to be blank, and only the year 2012 is specified.  (*See* Guzzardi Aff. Ex. 2.)  "Guzzardi Aff." refers to the Affidavit of Dominico Guzzardi in Support of Defendants' Motion for Partial Summary Judgment, filed February 3, 2017.  (Doc 56.)  The exhibits of the Guzzardi Affidavit do not have consecutive page numbers, and thus all page numbers refer to the pages designated by the court's Electronic Case Filing ("ECF") system.

[6] "Long Decl." refers to the Declaration of Nigel Long in Support of Plaintiff's Motion for Partial Summary Judgment, filed February 18, 2017.  (Doc. 69.)

and . . . to use the Trademarks . . . in connection with the marketing and distribution of the Product." (Guzzardi Aff. Ex. 2, at 2.) Although the right to distribute products was "exclusive," under the terms of the agreement, the right to use the Faram Trademarks was a "non-exclusive and transferable right and license to use the Trademarks" in connection with the sale of Old Faram products. (*Id.* at 9.)

The 2012 Distributorship Agreement also states that it "may not be transferred, delegated, or assigned by either party without the prior written consent of the other party," and that the agreement would "be binding upon" and "inure to the benefit of . . . the permitted successors and assigns" of either party. (*See id.* at 10.) The 2012 Distribution Agreement does not specifically address bankruptcy other than to state that "assignment by either party for the benefit of creditors, the initiating proceedings in bankruptcy, or the appointment of a receiver for either party shall be construed to be a default," and that the non-defaulting party would have the ability to terminate the agreement upon notice of default and inability to remedy that default within sixty days. (*Id.*)

### B. *The Faram Trademarks*

Old Faram registered the Faram Trademarks with the World Intellectual Property Organization ("WIPO") in October 1992, and in March 2005 filed with the USPTO to extend its 1992 WIPO registration to the United States. (Pl.'s 56.1 ¶¶ 2–3; Defs.' Reply 56.1 ¶¶ 2–3.)[7] The Faram Trademarks were registered with the USPTO as trademark numbers 3154261, 3154261, and 3158999, and the USPTO's trademark database lists Old Faram as the original registrant of the Faram Trademarks. (Pl.'s 56.1 ¶ 1; Defs.' Reply 56.1 ¶ 1; *see also* Yeung Decl.

---

[7] "Defs.' Reply 56.1" refers to Defendants' Response to Plaintiff's 56.1 Statement of Undisputed Material Facts, filed March 24, 2017. (Doc. 95.)

Ex. A.)[8]  The Faram Trademarks gained "incontestability status" under Section 15 of the

Lanham Act, 15 U.S.C. § 1065, in February 2012.  (Pl.'s 56.1 ¶ 4; Yeung Decl. Ex. D.)[9]

### C.    *FGM and the Trademark Sale Agreement*

Beginning in May 2012, FGM Services, Inc. ("FGM"), one of Faram US's creditors,

provided services for Faram US, including installation services for Old Faram's furniture in the

United States.  (*See* Defs.' Reply 56.1 ¶¶ 34–35; Defs.' 56.1 ¶ 8.)  FGM continued providing

these services in the United States in 2013.  (*See* Defs.' Reply 56.1 ¶¶ 34–35.)

According to Defendants, Old Faram and FGM also entered into a Trademark Sale

Agreement ("TSA"), dated June 27, 2013, which provided that upon payment of €300,000 to

Nimio S.r.L. ("Nimio"), a third party, Old Faram would grant to FGM "ownership of the Faram

trademarks . . . with all attendant rights thereof, throughout the United States."  (Guzzardi Aff.

Ex. 7, at 1; Lau Decl. Ex. L, at 1.)[10]  According to the TSA, the "sale [would] take effect after the

first payment has been received by Nimio S.R.L."  (Guzzardi Aff. Ex. 7, at 1.)  Exhibit A

attached to the agreement contained a list of the Faram Trademarks, which were to be sold to

FGM pursuant to the TSA.  (*Id.* at 3.)  In addition, it stated that FGM's ownership of the

trademarks "shall not be affected or modified by a change in Seller's management, financial

---

[8] "Yeung Decl." refers to the Declaration of Stephanie Yeung in Support of Plaintiff's Motion for Partial Summary Judgment, filed February 18, 2017.  (Doc. 70.)  The exhibits of the Yeung Declaration do not have consecutive page numbers, and thus all page numbers refer to the pages designated by ECF.

[9] Defendants dispute whether the Faram Trademarks gained incontestability status because they claim that the declarations of incontestability were signed by attorney Douglas Christensen rather than by Old Faram, (Defs.' Reply 56.1 ¶ 4), but it appears from Exhibit D of the Yeung Declaration that the declarations of incontestability filed for the Faram Trademarks were accepted by the USPTO on or about May 30, 2012, (*see* Yeung Decl. Ex. D). Further, the USPTO registrations, listed on the USPTO webpage, include a notation that a Section 15 affidavit has been filed for each of the trademarks, signaling incontestability of the marks.  (Yeung Decl. Ex. 1, at 3, 5, 7.)  I am thus satisfied that the Faram Trademarks did gain incontestability status at in 2012.

[10] "Lau Decl." refers to the Declaration of Jessica M. Lau in Opposition to Defendants' Motion for Partial Summary Judgment, filed February 24, 2017.  (Doc. 77.)  The exhibits of the Lau Affidavit do not have consecutive page numbers, and thus all page numbers refer to the pages designated by ECF.

position or bankruptcy." (*Id.* at 1.)

In December 2013, between the time that the TSA was dated and the time that both parties signed the agreement, Old Faram's shareholders approved an investment by Nimio, making Nimio a 99.1% shareholder of Old Faram. (Pl.'s 56.1 ¶ 8; Defs.' 56.1 ¶ 13.) FGM made three separate payments to Nimio on June 25, 2013 for €100,000, on July 29, 2013 for €95,000, and on August 2, 2013 for €100,000, (Pl.'s 56.1 ¶ 38; *see also* Defs.' 56.1 ¶ 12), for a total of €295,000. Both parties then signed the TSA on January 27, 2014, (Pl.'s 56.1 ¶ 36; Defs.' 56.1 ¶ 15), but based on the terms of the agreement, the date of the first payment, June 25, 2013, would be considered the effective date of the TSA, (*see* Guzzardi Aff. Ex. 7, at 1). FGM did not register its ownership of the Faram Trademarks with WIPO or USPTO. (Pl.'s 56.1 ¶ 39; Defs.' Reply 56.1 ¶ 39.)

### D.    *Old Faram's Financial Distress and Bankruptcy*

By late 2013, Old Faram was experiencing significant financial difficulty, and restructured in 2013 to avoid insolvency. (Pl.'s 56.1 ¶¶ 5–6.) On November 20, 2013, Old Faram purportedly entered into a pledge agreement (the "Old Faram Pledge Agreement") that pledged the Faram Trademarks to Old Faram's banks. (*Id.*; *see also* Nitti Decl. Ex. A.)[11] Old Faram registered the Old Faram Pledge Agreement with WIPO, and it appeared as a "[r]estriction of the holder's right of disposal" in the WIPO registration. (Yeung Decl. Ex. B, at 6.) Specifically, the WIPO registration stated that "the holder's right of disposal of the above-mentioned international registrations has been restricted in all the Contracting Parties, following the execution of a 'Deed of Pledge on a Trademark' executed on November 21, 2013, in Treviso

---

[11] "Nitti Decl." refers to the Declaration of Massimiliano Nitti in Support of Plaintiff's Motion for Partial Summary Judgment, filed March 2, 2017. (Doc. 83.) The exhibits of the Nitti Declaration do not have consecutive page numbers, and thus all page numbers refer to the pages designated by ECF.

(Italy) by the Legal Representative of Faram S.p.A." (*Id.* at 6.)

Old Faram's financial difficulties continued, and on May 6, 2014 it filed a petition for voluntary liquidation in a bankruptcy court in Treviso, Italy (the "Petition"). (Pl.'s 56.1 ¶ 11; *see* Nitti Decl. Ex. H.)[12] The Petition listed the Faram Trademarks as "intangible assets" and included an expert appraisal of their value by Dr. Alberto Borelli. (Nitti Decl. Ex. H pt. 2, at 19–24.) The Petition discussed Old Faram's restructuring and the Old Faram Pledge Agreement, (*id.* at 2), and declared that Old Faram, "in light of its own irreversible insolvency, now intends to petition for its own bankruptcy per Article 14 of the Bankruptcy Act, with the corresponding launch of competitive proceedings for the assignment of its assets to the best bidder," (*id.* at 3). On May 9, 2014, a panel of three judges in the Second Civil Section of the Court of Treviso declared Old Faram bankrupt. (Nitti Decl. Ex. C.) The judgment appointed the Honorable Alberto Valle as the bankruptcy judge and Riccardo Prencis Pucher as the bankruptcy receiver (the "Receiver"). (*Id.* at 7.)

On July 3, 2014, the Receiver submitted a liquidation plan to Judge Valle informing the Judge of an offer from Aliante Partners S.r.l. ("Aliante") to purchase a portion of Old Faram. (Nitti Decl. Ex. G pt. 3, at 5.) The submission stated that the offer was "for the acquisition of some assets . . . primarily the intangible assets" owned by Old Faram. (*Id.*) According to the Receiver, the offer was for "the acquisition of the intangible assets for €620,000, the portion of the warehouse for production of glass and metal wall units for €140,000, [and] the furniture and

---

[12] Defendants dispute the existence of the Petition, stating that the "Petition is irrelevant and inadmissible hearsay" and that "Nitti's declaration is inadmissible." (Defs.' Reply 56.1 ¶ 11.) Although I do not make any determination as to the truth of the matters asserted in the documents submitted to the Italian court, I take judicial notice of the documents submitted in this proceeding that were filed in the Italian court. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts, again not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").

shop machinery of the facilities in Giavera del Montello, Milan, Parma and Rome as well as the molds for the production of aluminum shapes for €50,000"—for a total cost of €810,000. (*Id.* at 7; *see also* Nitti Decl. Ex. B.) The intangible assets included the Faram Trademarks, which the Receiver stated were estimated to be worth €1,050,000 during the appraisal. (Nitti Decl. Ex. G pt. 3, at 7.) In light of Aliante's offer, the Receiver requested the initiation of a bidding procedure for the sale of Old Faram using a base price equal to Aliante's offer. (*Id.* at 8–9.) He further requested that the sale take place at the Instituto di Vendite Giudiziarie di Treviso ("IVG"), and that IVG organize the bidding process. (*Id.* at 9.)

The Receiver published notice of the auction on July 9, 2014, and the court received two offers to acquire Old Faram by the August 4, 2014 deadline—the first from Fosam Architettura S.r.l. and the second from Aliantech S.p.A. ("Aliantech"), a wholly owned subsidiary of Aliante. (Nitti Decl. Ex. E, at 6–7.) The bidding took place immediately after the offers were due in the Treviso Courthouse on August 4, 2014 at 12:30 p.m. (*See id.* at 6.)

At the proceeding, Judge Valle awarded Old Faram's assets to Aliantech. (*Id.* at 8.) The assets included: (1) Old Faram's trademarks for €1,170,000; (2) office equipment and furnishings for €50,000; (3) machinery from one of Old Faram's facilities, the Giavera del Montello facility, for €310,000; and (4) goods stored in the Giavera del Montello facility's warehouse for €140,000. (*Id.*) Aliantech was to pay a total of €1,670,000 for the aforementioned assets. (*Id.*)

By Order dated August 11, 2014, Judge Valle transferred these assets to Aliantech (the "Valle Order"). (Nitti Decl. Ex. F pt. 1, at 29.) The Valle Order listed the trademarks being transferred, which included the rights to use the Faram Trademarks internationally in countries including, but not limited to, the United States. (*See, e.g.*, *id.* at 44, 46, 52.) The Valle Order

stated that the assets would be "transferred completely free of liabilities and obligations connected with and/or derived in any capacity from acts or facts preceding said transfer, if they are not attributable to the transferee." (*Id.* at 30.) On August 18, 2014, the restrictions on use of the Faram Trademarks, listed on the WIPO website pursuant to the Old Faram Pledge Agreement, were lifted. (*See, e.g.*, Yeung Decl. Ex. B, at 6 ("[T]he holder's right of disposal of the above-mentioned international registrations has been released in all the designated Contracting Parties, following the execution of a decree of cancelation of pledge executed by the judge of the Civil Court of Treviso. Therefore, the International Trademark registrations . . . are no longer subject to any pledge.").) Further, according to the USPTO website, on January 8, 2015, Old Faram assigned the entire interest of the Faram Trademarks to Aliantech. (*Id.* Ex. F, at 7.) On February 12, 2015, the Faram Trademarks were assigned from Aliantech to Faram 1957 pursuant to Aliantech's decision to change its name to Faram 1957. (*Id.*) The name change was also recorded with the WIPO. (*See id.* Ex. B, at 2, 7, 12).

### E.      *Communications with Faram US, FGM, and Faram Holding*

Defendant Faram Holding was formed by Defendant Ingallinera on January 3, 2014. (*See* Pl.'s Reply 56.1 ¶ 1; Yeung Decl. Ex. I.) According to Defendants, shortly thereafter, on January 10, 2014, it entered into a distributorship agreement with Old Faram establishing Faram Holding as "the exclusive, authorized distributor for the sale of [Old Faram products] in North America, including the United States, Canada and Mexico" (the "2014 Distributorship Agreement").[13] (Santosuosso Decl. Ex. J, at 2; *see also* Defs.' 56.1 ¶ 23.)[14] The 2014

---

[13] Plaintiff disputes that this contract was ever entered into. (Pl.'s Reply 56.1 ¶ 23.)

[14] "Santosuosso Decl." refers to the Declaration of Daniele U. Santosuosso in Support of Plaintiff's Motion for Partial Summary Judgment, filed February 18, 2017. (Doc. 71.) The exhibits of the Santosuosso Declaration do not have consecutive page numbers, and thus all page numbers refer to the pages designated by ECF.

Distributorship Agreement granted Faram Holding the right to "market and distribute [Old Faram products] everywhere within [North America, including the United States, Canada and Mexico, all countries in South America and Central America, all Caribbean Islands, Australia, New Zealand, the United Kingdom, and throughout the Middle East]" for an initial term of 25 years.  (Santosuosso Decl. Ex. J, at 2, 9.)  The 2014 Distributorship Agreement also stated that either party had the power to terminate the agreement based on a default by the other party. (*Id.* at 9.)  Further, according to Defendants, pursuant to an Asset Purchase Agreement between Faram Holding and FGM dated April 17, 2014 (the "APA"), FGM sold a portion of its assets, including the Faram Trademarks, to Faram Holding for $1,066,000.  (Yeung Decl. Ex. K, at 2–4; Guzzardi Aff. Ex. 10, at 1–3.)

In May 2014, the Receiver blocked the delivery of merchandise that Faram Holding had purchased from one of Old Faram's authorized vendors, Indinvest LT S.r.l. ("Indivest") pursuant to the 2014 Distributorship Agreement.  (Defs.' 56.1 ¶ 45; Pl.'s 56.1 ¶ 46.)  Prior to the public auction on August 4, 2014, Faram Holding's lawyer, Morena Federica Sciuto had been exchanging communications with the Receiver regarding the Receiver's blocking of the Indivest transaction.  (Pl.'s Reply 56.1 ¶ 48; *see also* Nitti Decl. Ex. I.)  In the course of these communications, the Receiver requested copies of agreements entered into between Old Faram and Faram Holding "including but not limited to, trademark license agreements, distribution agreements, [and] manufacturing agreements in connection with the products manufactured by Faram."  (Defs.' 56.1 ¶ 52; Pl.'s Reply 56.1 ¶ 52.)  The Receiver also told Sciuto that because "[i]t is settled that some agreements . . . affect the Faram trademark and [Old Faram's] ability to act abroad . . . we need to confirm what happened on a case by case basis."  (Pl.'s Reply 56.1 ¶ 52.)  In an email dated May 31, 2014, Sciuto told the Receiver that "Faram Holding reserves

the right to evaluate its interest in the Faram trademark and to submit a serious and concrete proposal to the Receiver within a very short time," but does not appear to have provided any of the documents the Receiver had requested.  (Nitti Decl. Ex. I pt. 1, at 50.)

Subsequently, on June 5, 2014, the Receiver informed Sciuto of the two bids that he had received for Old Faram's assets.  (*Id.* at 51.)  On the same day, the Receiver again requested that Faram Holding submit any documents related to its dealings with Old Faram so he could have a "complete picture of the agreements that [Old Faram], even through third party subjects . . . entered into with Faram Holding or Faram USA."  (*Id.*)  He asked Sciuto to "interpret th[e] request in the broadest sense, including any entity with which [Faram Holding] maintained relations that resulted in or are in any event associated with [Old Faram] or the Faram trademark[]:  therefore, including but not limited to licenses for use of the trademark, distribution agreements, agreements to allow the manufacture of goods associated with or corresponding to those which Faram already builds or was building, territorial exclusivity, etc."  (*Id.*)  Faram Holding did not provide any documents to the Receiver before the public auction.  (Pl.'s Reply 56.1 ¶ 47).

On June 6, 2014, the Receiver sent FGM a notice of Old Faram's bankruptcy in light of its status as one of Old Faram's creditors.  (Nitti Decl. Ex. L, at 9.)  On July 17, 2014, the Receiver formally notified Faram Holding that contracts between it and Old Faram permitting Faram Holding to purchase and distribute materials from Old Faram's suppliers were terminated pursuant to Article 72 of the Italian Bankruptcy Law.[15]  (Pl.'s 56.1 ¶ 22; Nitti Decl. Ex. J.)  He informed Faram Holding that it "must not use the name, symbols, trademarks and other distinctive features" of Old Faram "for any reason."  (Nitti Decl. Ex. J, at 3.)

---

[15] Defendants state that they never received this letter.  (Defs.' Reply 56.1 ¶ 22.)

Sciuto, as counsel for FGM,[16] filed a petition with the Court of Treviso requesting to be included in the list of Old Faram's creditors and to view the statement of liabilities. (Nitti Decl. Ex. M pt. 1, at 31–33.) In response, the Receiver submitted a note to the Office of the Clerk acknowledging that "no petitions have been filed by Faram Holding and Furniture Inc., and no appeals been submitted on the Appointed Judge's decision on the petition filed by FGM Services Inc." (*Id.* at 29–30.) On September 24, 2014, Judge Valle rejected the FGM's petition and "declared the enforceability of the statement of liabilities." (Nitti Decl. Ex. N, at 6.)

## II.   **Procedural History**

Plaintiff filed the Complaint in the instant action on April 1, 2016, alleging that Defendants unlawfully manufactured, promoted, and distributed furniture using the Faram Trademarks and seeking injunctive and monetary relief. (Compl. ¶¶ 1–2.) Plaintiff claims that, based on Old Faram's registration of the Faram Trademarks with the USPTO, it has exclusive rights to the marks. (*Id.* ¶ 6.) Thus, Plaintiff alleges that Defendants violated the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), the Anti-cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1), and New York General Business Law, N.Y. Gen. Bus. Law § 349. (*Id.* ¶¶ 23–43.)

On February 3, 2017, Defendants filed a motion for partial summary judgment, along with their memorandum of law, Rule 56.1 statement, and supporting affidavits with exhibits. (Docs. 53–59.) In their motion, Defendants argue that they own the Faram Trademarks, and request that I find that (1) the TSA and APA are valid and transfer ownership of the Faram Trademarks to Faram Holding, (2) Old Faram abandoned its trademark registrations with the USPTO, and (3) Defendants have the right to use the Faram Trademarks pursuant to the 2012

---

[16] Sciuto represented both Faram Holding and FGM during the course of Old Faram's bankruptcy. (*See* Pl.'s 56.1 ¶¶ 45, 58.)

and 2014 Distributorship Agreements.  (Defs.' Mem. 2–3.)[17]  In response, between February 24 and March 2, 2017, Plaintiff filed its counter-statement to Defendants' Rule 56.1 statement, as well as its memorandum of law and declarations in opposition.  (*See* Docs. 75–79, 81–82.) Defendants filed their reply on April 7, 2017.  (Doc. 99.)

On February 18, 2017, Plaintiff filed its motion for partial summary judgment, and in support filed its memorandum of law, Rule 56.1 statement, and declarations with exhibits. (Docs. 63–64, 66, 68–72, 83.)[18]  In its motion, Plaintiff requests that I find that it owns the Faram Trademarks and dismiss Defendants counterclaims alleging that the TSA, 2012 Distributorship Agreement, and 2014 Distributorship Agreements are valid.  (Pl.'s Mem. 1.)[19]  In response to Plaintiff's motion, Defendants filed their counter statement to Plaintiff's Rule 56.1 statement, as well as their memorandum of law and affidavits in opposition, on March 24, 2017.  (*See* Docs. 88–95.)  Plaintiff filed its reply on April 13, 2017.  (Doc. 103.)

## III.  <u>Legal Standard</u>

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see also* Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

---

[17] "Defs.' Mem." refers to Defendants' Memorandum of Law in Support of their Motion for Partial Summary Judgment, filed February 3, 2017.  (Doc. 54.)

[18] All documents were initially filed on February 18, 2017, but the Rule 56.1 statement and the Declaration of Massimiliano Nitti in Support of Plaintiff's Motion for Partial Summary Judgment were filed deficiently, so Plaintiff re-filed the Rule 56.1 statement on February 21, 2017, (Doc. 72), and the Nitti Declaration on March 2, 2017, (Doc. 83).

[19] "Pl.'s Mem." refers to Plaintiff's Memorandum of Law in Support of its Motion for Partial Summary Judgment, filed February 18, 2017.  (Doc. 64.)

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

"A party asserting that a fact cannot be . . . genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1).  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4). Any other evidence submitted in support of a motion for summary judgment must be in the form of evidence that would be admissible at trial.  *See* Fed. R. Civ. P. 56(c)(2), (e).  "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may,"

among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2), (3).

Additionally, in considering a summary judgment motion, a court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party."  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citation and internal quotation marks omitted); *see also Matsushita*, 475 U.S. at 587.  "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied.  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

When a defendant and plaintiff are both seeking summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (quoting *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).  Each moving party has the burden of demonstrating that there is no genuine issue of material fact.  *See Schultz v. Stoner*, 308 F. Supp. 2d 289, 297–98 (S.D.N.Y. 2004).  In addition, when a party seeks only partial summary judgment, and the claim on which summary judgment is sought is "inextricably woven to other claims which are destined for determination by the trier of fact, the action is better left fully intact."  *Berman v. Royal Knitting Mills, Inc.*, 86 F.R.D. 124, 126 (S.D.N.Y. 1980).

### IV.    Discussion

Both parties move for partial summary judgment concerning their respective claims to ownership of the Faram Trademarks.  Plaintiff argues that Faram 1957 owns the Faram Trademarks because (1) the Valle Order, which transferred the Faram Trademarks to Faram 1957, should be accorded comity, and (2) the TSA is unenforceable.  (Pl.'s Mem. 9–23.)  Plaintiff also moves for summary judgment with respect to Defendants' counterclaims that Defendants have the right to use the Faram Trademarks pursuant to the 2012 and 2014 Distributorship Agreements.  (*Id.* at 23–25.)  Defendants, on the other hand, argue that Faram Holding owns the Faram Trademarks based on (1) the validity of the TSA and APA and (2) the abandonment and thus termination of Plaintiff's rights to the Faram Trademarks.  (Defs.' Mem. 2.)  They also request a declaratory judgment as to their right to use the Faram Trademarks pursuant to the 2012 and 2014 Distributorship Agreements.  (Defs.' Mem. 2–3.)

Because the Valle Order did not specifically address, or make a finding with respect to, the ownership of the Faram Trademarks, I decline to accord comity and thus give res judicata effect to the Valle Order.  Further, since I find that there are material facts in dispute with respect to (1) the ownership of the Faram Trademarks, (2) Faram Holding's right to use the Faram Trademarks pursuant to the TSA and APA, and (3) Faram Holding's right to use the Faram Trademarks pursuant to the 2014 Distributorship Agreement, both parties' motions for summary judgment as to these issues are DENIED.  Because I find that the 2012 Distributorship Agreement could not be assigned as a matter of law, solely with respect to the issue of the licensing of the Faram Trademarks pursuant to this agreement Defendants' motion for partial summary judgment is DENIED and Plaintiff's motion is GRANTED.

### A. *Comity*

#### 1. Applicable Law

Comity is "neither a matter of absolute obligation . . . nor of mere courtesy and good will," but is based on "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Hilton v. Guyot*, 159 U.S. 113, 163–64 (1895). It is a principle that "takes into account the interests of the United States, the interests of the foreign state, and those mutual interests the family of nations have in just and efficiently functioning rules of international law." *Maxwell Commc'n Corp. v. Societe Generale*, 93 F.3d 1036, 1048 (2d Cir. 1996).

Judgments reached in foreign courts can be given res judicata effect—and thus preclude litigation in domestic courts—based on principles of comity where "the parties, issues and evidence in both litigations are the same or substantially similar." *Calzaturificio Rangoni S.p.A. v. U.S. Shoe Corp.*, 868 F. Supp. 1414, 1419 (S.D.N.Y. 1994); *see also China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 36 (2d Cir. 1987). Further, res judicata is typically only applied when the previous action involved (1) an adjudication on the merits, (2) the same parties, and (3) the same claims. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 499 (2d Cir. 2014). Courts will only accord comity to a judgment reached in a foreign court if it would not offend U.S. laws or public policy and the foreign court abides by "fundamental standards of procedural fairness." *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005) (quoting *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999)); *see also Kenner Prods. Co. v. Societe Fonciere et Financiere Agache-Willot*, 532 F. Supp. 478, 479 (S.D.N.Y 1982).

Where trademark rights are at issue, courts in this Circuit have found that "the decisions

of foreign courts concerning the respective trade-mark rights of the parties are irrelevant and inadmissible" for the purpose of res judicata. *CSFB Holt LLC v. Collins Stewart Ltd.*, No. 02 Civ. 3069(LBS), 2004 WL 1794499, at *3 (S.D.N.Y. Aug. 10, 2004) (quoting *Vanity Fair Mills, Inc. v. The T. Eaton Co.*, 234 F.2d 633, 639 (2d Cir. 1956)). This is because a "trademark is inherently territorial and it exists in each country solely according to that particular country's statutory scheme." *Calzaturificio Rangoni*, 868 F. Supp. at 1418. Thus, when determining ownership of a trademark in the United States, courts must look to the requirements of the Lanham Act in making its determination. *Id.* ("Once a trademark has been registered in the United States, 'its status is independent of the continued validity of its registration abroad, and its duration, validity, and transfer in the United States are governed by' the Lanham Act." (quoting *Vanity Fair Mills*, 234 F.2d at 644)).

## 2. Application

Plaintiff argues that comity warrants deference to the Valle Order, and thus summary judgment in its favor, on the issue of ownership of the Faram Trademarks. (Pl.'s Mem. 9.) It states that because "[p]ursuant to the [Valle Order], the Italian bankruptcy court conveyed ownership of the Faram Marks to Faram 1957, including ownership of the U.S. rights to the Faram Marks," the court should find that Faram 1957 has the rights to use the Faram Trademarks in the United States. (*Id.*)

The issues before me, however, are not the "same or substantially similar," to the issues before Judge Valle in Old Faram's bankruptcy. *See Calzaturificio Rangoni*, 868 F. Supp. at 1419. Plaintiff fails to show that Judge Valle made a specific determination regarding ownership of the Faram Trademarks, as opposed to simply assuming that Faram 1957 owned the Faram Trademarks without analyzing the issue of ownership. In fact, various submissions from

Plaintiff state that Defendants failed to submit copies of the TSA, 2012 Distributorship Agreement, and 2014 Distributorship Agreement to the Receiver.[20]  (*See* Pl's 56.1 ¶¶ 55–56; Pl.'s Reply 56.1 ¶ 47.)  This suggests that Judge Valle did not have access to these agreements— the very documents the Judge would have needed in order to make a determination concerning the ownership of the Faram Trademarks—during Old Faram's bankruptcy proceeding.  Indeed, the terms of the Valle Order tacitly acknowledge that the order does not definitively decide issues of ownership because it recognizes that "the proceeding assumes no responsibility regarding the delivery of assets existing with third parties, or for potential disputes relating to their ownership and quality;" that "all individual assets shall be transferred 'as is,' in their current state;" and that there is a possibility that Old Faram's assets were not being "transferred completely free of liabilities and obligations . . . attributable to [Old Faram]."  (Nitti Decl. Ex. F pt. 1, at 30.)

While considerations of comity may militate against any attack on the Italian bankruptcy proceedings themselves, *see Victrix S.S. Co. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713–14 (2d Cir. 1987), the instant case for trademark infringement is not dependent on, and does not implicate, any findings in the Valle Order, *see Frink Am., Inc. v. Champion Road Mach. Ltd.*, 961 F. Supp. 398, 405 (N.D.N.Y. 1997) (declining to accord comity to foreign bankruptcy proceedings because "the Court [was] unconvinced that plaintiff's case stands or falls on the validity of those proceedings" and believed the claims were instead related to the plaintiffs "failure to and breach of its Agreement to . . . return . . . intellectual property").  The Valle Order related to Old Faram's bankruptcy and its subsequent reallocation of resources—as stated above,

---

[20] Pucher undoubtedly requested these documents so that he could assess as Receiver, among other things, issues related to of the Faram Trademarks.

Judge Valle did not make a specific determination as to the ownership of the Faram Trademarks, nor did Faram Holding appear to have challenged the ownership of the Faram Trademarks during the course of Old Faram's bankruptcy proceeding. It was only after Judge Valle had declared Old Faram bankrupt that Faram Holding petitioned to be included in Old Faram's list of creditors. (*See* Nitti Decl. Ex. M pt. 1, at 31–33.)

Further, although the record indicates that Faram Holding communicated with the Receiver, (*see* Nitti Decl. Ex. I), there is no indication that Faram Holding appeared in front of Judge Valle or that the issue of the ownership of the Faram Trademarks was litigated at that time. Thus, the Valle Order neither involved an adjudication of the merits as to the question of ownership of the trademarks, nor did it involve the same parties or claims—all factors typically necessary for res judicata to apply. *See TechnoMarine*, 758 F.3d at 499.

In addition, according comity to the Valle Order would offend U.S. law. It would directly contradict case law stating that comity should not play a role in trademark infringement cases. *See Vanity Fair Mills*, 234 F.2d at 639 ("[W]hen trade-mark rights within the United States are being litigated in an American court, the decisions of foreign courts concerning the respective trade-mark rights of the parties are irrelevant and inadmissible."); *Calzaturificio Rangoni*, 868 F. Supp. at 1419 ("There is specific United States case law stating that foreign judgments should not be regarded in Lanham Act cases."). Because the issue before me relates to ownership of the Faram Trademarks within the United States, and the Faram Trademarks have been registered with the USPTO, I must look to the requirements of the Lanham Act to make my determination. *See Calzaturificio Rangoni*, 868 F. Supp. at 1418–19.

Because the instant case does not include the same parties, nor raise substantially similar issues, as those before Judge Valle, and because comity would offend U.S. law, I decline to give

res judicata effect to the Valle Order.

**B.      *Assignment and Licensing of the Faram Trademarks***

**1.  Applicable Law**

Section 32 of the Lanham Act, 15 U.S.C. § 1114(1), grants any "registrant" of a

trademark standing to assert a claim for trademark infringement.  Section 1125(a) of the Lanham

Act holds liable:

> Any person who, on or in connection with any goods or services, or any
> container for goods, uses in commerce any word, term, name, symbol, or
> device, or any combination thereof, or any false designation of origin, false
> or misleading description of fact, or false or misleading representation of
> fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive
> as to the affiliation, connection or association of such person with another
> person, or as to the origin, sponsorship, or approval of his or her goods,
> services, or commercial activities by another person . . . .

15 U.S.C. § 1125(a)(1).  A plaintiff asserting a claim under this section must first show "it has a

valid trademark entitled to protection," and if successful, must then provide evidence that "the

defendant's use of it is likely to cause confusion of an appreciable number of ordinarily prudent

purchasers as to the source of goods or services in question."  *Info. Superhighway, Inc. v. Talk

Am., Inc.*, 395 F. Supp. 2d 44, 50 (S.D.N.Y. 2005); *see also Gruner + Jahr USA Publ'g v.

Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993).

A mark is capable of protection if it is either "inherently distinctive" or has "acquired

distinctiveness through secondary meaning."  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S.

763, 769 (1992).  "Registered trademarks are presumed to be distinctive and should be afforded

the utmost protection."  *Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 520 (S.D.N.Y. 2009) (quoting

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986)).

Generally, trademark rights go to the first to use the mark rather than the first to register.  *See

ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 146 (2d Cir. 2007) ("[O]ne of the fundamental

premises underlying the registration provisions in the Lanham Act is that trademark rights flow

from priority and that priority is acquired through use.").  Certificates of Registration from the

USPTO, however, are prima facie evidence that "the mark is registered and valid (*i.e.*,

protectible), that the registrant owns the mark, and that the registrant has the exclusive right to

use the mark in commerce."  *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d

337, 345 (2d Cir. 1999); *see also* 15 U.S.C. § 1115(a).  Further, evidence that a trademark has

been deemed "incontestable" by the USPTO is conclusive evidence of exclusive ownership.

*Gruner + Jahr*, 991 F.2d at 1076–77; *see also* 15 U.S.C. § 1115(b).

      In determining whether there is a likelihood of confusion, courts analyze whether

"numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the

product in question because of the entrance in the marketplace of defendant's mark."  *Cadbury

Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 477–78 (2d Cir. 1996) (quoting *Gruner + Jahr*, 991

F.2d at 1077).  Courts must find that confusion is probable, not merely possible.  *See Gruner +

Jahr*, 991 F.2d at 1077.  With respect to this prong, courts balance multiple factors including:

(1) the strength of the mark, (2) the degree of similarity between marks, (3) the competitive

landscape of the marks, (4) likelihood that either owner with bridge the gap, (5) evidence of

actual confusion between the marks, (6) a defendant's bad faith, (7) the quality of a defendant's

product, and (8) the sophistication of the group.  *See Polaroid Corp. v. Polarad Elec. Corp.*, 287

F.2d 492, 495 (2d Cir. 1961).  No one factor is dispositive.  *See Lois Sportswear*, 799 F.2d at

872.

      Section 32 of the Lanham Act only provides for liability where another party acts

"without consent of the registrant."  15 U.S.C. § 1114(1).  Thus, where the owner of a trademark

validly assigns or licenses the trademark pursuant to a contract, giving the party a right to use its

trademarks, "the existence of the contractual license may bar the licensor from bringing Lanham Act claims against the licensee." *Benihana of Tokyo, LLC v. Benihana, Inc.*, 14 Civ. 224 (PAE), 2017 WL 1424325, at *6 (S.D.N.Y. Apr. 19, 2017). In cases where a trademark has been assigned to another party, courts will consider the assignee as the "registrant," and thus the owner of the mark, for the purpose of the Lanham Act as long as the assignment is valid. *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 623 F.3d 61, 67–68 (2d Cir. 2010). "[O]nly after a *valid* assignment of trademarks does the assignee succeed to the rights of the assignor." *Id.* at 68. Thus, in a trademark infringement action where there has been an assigned trademark, a federal court must, as an initial matter, determine the validity of the assignment under state contract law. *See Rare Earth, Inc. v. Hoorelbeke*, 401 F. Supp. 26, 37 n.20 (S.D.N.Y. 1975) ("[I]n order to determine the federal claim for infringement, the district court, as a preliminary matter, permits the plaintiff to establish . . . his claim of ownership.").

In addition to requirements for assignment under state contract law, for a valid assignment under the Lanham Act the assignor must (1) sell or transfer all rights in the mark and (2) assign the business's goodwill connected with the marks. *See Prince of Peace Enters., Inc. v. Top Quality Food Market, LLC*, 760 F. Supp. 2d 384, 391 (S.D.N.Y. 2011). In other words, the assignor must "convey[] the assets of the business to the assignee together with the trademarks, provided that the assignee is going to use them in a business that will provide essentially the same type of products or services as the assignee had done in the past." *BLT Rest. Grp. LLC v. Tourondel*, 855 F. Supp. 2d 4, 30 (S.D.N.Y 2012). This assignment must be in a "duly executed writing that purports to convey title or ownership" of the trademarks to the other party. *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.*, No. 04 CV 08510(GBD), 2011 WL 4005321, at *6 (S.D.N.Y. Sept. 1, 2011), *aff'd sub nom. Fed. Treasury Enter. Sojuzplodoimport*

*v. SPI Spirits Ltd.*, 726 F.3d 62 (2d Cir. 2013).

### 2. Application

Old Faram initially owned the Faram Trademarks, as evidenced by its registration of the trademarks with the USPTO and the subsequent "incontestability status" of the marks. (Pl.'s 56.1 ¶¶ 1–4.) The registration and "incontestability status" evidence both the fact that the Faram Trademarks are valid and entitled to protection and that Old Faram had exclusive ownership of the Faram Trademarks before its bankruptcy. *See Gruner + Jahr*, 991 F.2d at 1076; 15 U.S.C. § 1115(b).

#### a. <u>Assignment of the Faram Trademarks under the TSA</u>

Plaintiff moves for summary judgment with respect to Faram 1957's ownership of the Faram Trademarks based on the fact that the TSA is unenforceable for lack of consideration. (Pl.'s Mem. 21–23.) Defendants also move for summary judgment on the issue of the ownership of the Faram Trademarks, alleging that Faram Holding owns the Faram Trademarks based on the validity of the TSA and the APA. (Defs.' Mem. 2.)

Because the TSA is "governed by . . . the laws of the State of New York," (Guzzardi Aff. Ex. 7, at 2; Lau Decl. Ex. L, at 2), and both parties have cited to New York law, I will analyze the TSA with reference to the laws of New York. Under New York law, a valid contract requires an "offer, acceptance, consideration, mutual assent and intent to be bound." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004). "Consideration" is "either a benefit to the promisor or a detriment to the promisee." *Weiner v. McGraw-Hill, Inc.*, 457 N.Y.S.2d 193, 196 (1982). "[I]t is enough that something is promised, done, forborne or suffered by the party to whom the promise is made as consideration for the promise made to him." *Id.* (quoting *Hamer v. Sidway*, 124 N.Y. 538, 545 (1891)). Moreover, as long as there is an exchange of something

with "real value in the eye of the law," the adequacy of consideration is not subject to judicial review. *Apfel v. Prudential–Bache Sec., Inc.*, 600 N.Y.S.2d 433, 435 (1993).

As an initial matter, it is unclear whether Old Faram possessed the right to grant FGM "ownership of the Faram trademarks . . . with all the attendant rights thereof, throughout the United States" in 2013 when it entered into the TSA with FGM. (Guzzardi Aff. Ex. 7, at 1; Lau Decl. Ex. L, at 2.) The 2012 Distributorship Agreement purportedly entered into between Old Faram and Faram US granted Faram US the "right to market and distribute" Old Faram's products and to "use the Trademarks . . . in connection with the marketing and distribution" of Old Faram products. (Guzzardi Aff. Ex. 2, at 1.) The 2012 Distributorship Agreement also states that the rights granted pursuant to the agreement could not be "transferred, delegated, or assigned by either party without the prior written consent of the other party." (*Id.* at 10.) Based on the record, there is no evidence that Old Faram ever obtained prior written consent from Faram US to grant FGM ownership of the Faram Trademarks in the United States. Thus, whether Old Faram had the authority to enter into this agreement is largely dependent on whether the 2012 Distributorship Agreement was a valid and enforceable contract—which, as I state below, raises a genuine dispute of material fact.

Irrespective of the above, the parties have raised a genuine dispute of material fact as to the validity of the TSA on other grounds. Plaintiff claims that the TSA is invalid because of lack of consideration, stating that there was no consideration for the TSA because "FGM never paid €300,000 to Old Faram to purchase the U.S. rights to the Faram Marks." (Pl.'s Mem. 21–22.) I disagree. Whether Defendants ultimately paid the €300,000 as specified in the TSA does not bear on the existence of consideration. As long as "something is promised" in exchange for another party's promise, and a contract is executed based on this exchange, there is sufficient

consideration for a valid contract under New York law. *Weiner*, 457 N.Y.S.2d at 196; *see also Startech, Inc. v. VSA Arts*, 126 F. Supp. 2d 234, 237 (S.D.N.Y. 2000) (stating that consideration is a "bargained for gain or advantage to the promisee or a bargained for legal detriment or disadvantage to the promisor"). In such circumstances, the issue is not the failure of consideration but one of breach of contract. *See, e.g.*, *Minuteman Press Int'l, Inc. v. Matthews*, 232 F. Supp. 2d 11, 16–17 (E.D.N.Y. 2002) (stating that the court's determination that there as a valid contract as a matter of law defeated the defendants' claim for lack of consideration); *Benefit Concepts N.Y., Inc. v. Benefit Concepts Sys., Inc.*, No. 93 Civ. 1961 (DLC), 1995 WL 133773, at *3 (S.D.N.Y. Mar. 28, 1995) (analyzing a claim for failure to pay a licensing fee for a trademark as a breach of contract). Because here FGM promised to pay €300,000 in exchange for Old Faram's assignment of the Faram Trademarks, there was consideration for the TSA.

There is a genuine issue of material fact, however, as to whether FGM ultimately performed under the terms of the TSA. Plaintiff does not dispute that FGM sent three separate wire transfers of funds to Nimio on July 25, July 29, and August 2, 2013. (Pl.'s Mem. 22.) It does dispute, however, whether the wires were payments pursuant to the TSA or payments for "goods" unrelated to the TSA. (*See id.*) Plaintiff alleges that FGM paid €295,000 to Nimio not to purchase the Faram Trademarks pursuant to the TSA, but rather for "materials" and "goods" for their inventory; in other words, the payments were made for something completely separate, and that this is the reason for the discrepancy in the amount that was ultimately paid. (*Id.*) Defendants, on the other hand, claim that these three wires were paid pursuant to the TSA, and does not offer an explanation for why the payments were for €295,000 rather than the agreed-upon €300,000. (*See* Defs.' Mem. 16; Defs.' 56.1 ¶ 11–12.) This question of fact—the purpose of the payments from FGM to Nimio—precludes summary judgment as to the ownership of the

Faram Trademarks.

There is also a genuine issue of material fact as to whether the contract was, in fact, signed by Francesco Mio, who was President of Old Faram from September 2011 to May 2014. (Lau Decl. Ex. C, ¶ 2.) Mio provides conflicting information in two separate declarations. In his first declaration, sworn to on July 6, 2016, Mio states that "[i]n [his] capacity as president of Faram S.p.A., [he] signed a Trademark Sale Agreement" and that pursuant to this agreement Old Faram "intended to sell and did sell to FGM . . . the trademarks." (*Id.* ¶¶ 4–5.) In his second declaration, sworn to on September 21, 2016, Mio states that the TSA is a "forgery" and that he "never saw the [TSA], signed, or unsigned, in English or Italian, in draft form or otherwise, until it was provided to [him] by . . . [his] lawyer, on September 15, 2016." (*Id.* Ex. D, ¶¶ 9–10.)

Defendants claim that during the pre-motion conference held before me on October 19, 2016, Plaintiff stated that the parties would assume that the TSA is not a forgery for the purposes of this motion. (Defs.' Mem. 16 n.2.) Plaintiff disputes this characterization of what was said, and claims that Plaintiff's counsel stated at the conference that Plaintiff would assume that the TSA was in fact signed by Mio for the purpose of its own motion. (*See* Pl.'s Opp. 9–10 n.2.)[21] In any event, since the parties have not stipulated to the authenticity of the TSA, nothing said or done by the parties is binding on me. The question of whether the TSA was in fact executed by Mio, however, is vital to the validity of the TSA, and cannot be ignored for the purpose of the parties' summary judgment motions. This creates an additional genuine dispute of material fact that must be decided by a jury.

Because there are multiple issues of fact regarding the validity of the TSA, Plaintiff's

---

[21] "Pl.'s Opp." refers to Plaintiff's Memorandum of Law in Opposition to Defendant-Counterclaimant's Motion for Partial Summary Judgment, filed February 24, 2017. (Doc. 76.)

motion for summary judgment with respect to its Lanham Act claim pursuant to 15 U.S.C.

§ 1114 is DENIED.  Defendants' motion for summary judgment requesting a declaration that the

TSA is valid, as well as Plaintiff's cross-motion on this issue, are also DENIED.[22]

         b.   Licensing of the Faram Trademarks Under the 2012
             Distributorship Agreement

Plaintiff also moves for summary judgment with respect to Defendants' counterclaim that

Defendants have the right to use the Faram Trademark pursuant to the 2012 Distributorship

Agreement purportedly entered into between Old Faram and Faram US in 2012.  (Pl.'s Mem.

23–24.)  Plaintiff requests that I find that Defendants have no such right pursuant to the 2012

Distributorship Agreement and enter judgment in its favor.  (*Id.*)

The 2012 Distributorship Agreement is governed by the laws of New York, and I

therefore apply New York law to interpret the agreement.  (Guzzardi Aff. Ex. 2, at 11.)  As such,

the validity of the 2012 Distributorship Agreement hinges on whether there was an "offer,

acceptance, consideration, mutual assent and intent to be bound."  *Register.com*, 356 F.3d at 427.

According to Defendants, the 2012 Distributorship Agreement made Faram US the

"exclusive, authorized" distributor for the sale of Old Faram's products in the United States.

(*See* Guzzardi Aff. Ex. 2, at 1; Defs.' Mem. 17.)  Defendants claim that they now possess the

rights assigned to Faram US pursuant to the 2012 Distributorship Agreement because (1) in

December 2013, Faram UK "sold and transferred to FGM 90% of the capital stock of Faram

US," (*id.*; *see also* Pl.'s Mem. 23–24); and (2) subsequently, in April 2014, Faram Holding

entered into the APA with FGM to purchase certain assets from FGM including the rights to the

---

[22] As there are questions of fact as to the validity of the TSA, I will not analyze the validity of the APA, which
purports to transfer the Faram Trademarks on the basis that the TSA validly transferred the Faram Trademarks from
Old Faram to FGM.  Although the parties also discuss the validity of the APA in their briefs, (*see* Pl's Mem. 23–25;
Defs.' Mem. 16–17), the validity of the APA does not affect the ownership of the Faram Trademarks unless the TSA
is valid.

Faram Trademarks pursuant to the 2012 Distributorship Agreement, (Pl.'s Mem. 24; Defs.'

Reply 56.1 ¶ 43 (stating that it is undisputed that Faram Holding "purported to purchase certain

assets of FGM, including Faram US and the Faram Marks")).  In short, Defendants allege that

because the rights transferred to Faram US through the 2012 Distributorship Agreement were

transferred twice—once to FGM and again to Faram Holding—Faram Holding acquired those

rights.

Although the version of the 2012 Distributorship Agreement before me is not signed by

Faram US,[23] (*See* Guzzardi Aff. Ex. 2, at 1, 14)—calling into question whether there was mutual

assent or intent to be bound by the agreement and raising genuine issues of material fact—the

terms of the 2012 Distributorship Agreement do not allow assignment, meaning the rights

pursuant to this agreement could not be assigned as a matter of law.  The agreement explicitly

states that it "may not be transferred, delegated, or assigned by either party without the prior

written consent of the other party."  (*Id.* at 10.)  Thus, even if the contract was valid, the

assignment provision would preclude Faram US from assigning its rights under the agreement to

any other party without Old Faram's permission.  Since there is no evidence in the record that

demonstrates that such written permission was given, Faram US's rights pursuant to the 2012

Distributorship Agreement could not have been transferred to FGM or to Faram Holding.

Because the 2012 Distributorship Agreement, even if valid, could not be assigned to

Faram Holding, Defendants' motion for summary judgment requesting a declaration that they

had the right to use the Faram Trademarks pursuant to the 2012 Distributorship Agreement is

DENIED, and Plaintiff's motion for summary judgment on this issue is GRANTED.

---

[23] While there is a signature by Francesco Mio on behalf of Old Faram, Faram US's signature block remains blank. (*See* Guzzardi Aff. Ex. 2, at 14.)

c.  Licensing of the Faram Trademarks Under the 2014
Distributorship Agreement

Similarly, Plaintiff moves for summary judgment with respect to Defendants'

counterclaim that Defendants have the right to use the Faram Trademarks in the United States

pursuant to the 2014 Distributorship Agreement.  (Pl.'s Mem. 25.)  Plaintiff requests that I enter

summary judgment in its favor as to the issue of Defendants' rights under the 2014

Distributorship Agreement.  (*Id.*)

The 2014 Distributorship Agreement between Old Faram and Faram Holding is also

governed by the laws of New York, and was signed by both parties on January 10, 2014.

(Santosuosso Decl. Ex. J., at 1, 10.)  The agreement established Faram Holding as the "exclusive,

authorized distributor" for Faram products in the United States.  (*Id.* at 2.)

Based on Defendants' development of the factual record, it is unclear whether, at the time

that the 2014 Distributorship Agreement was signed, Old Faram had the ability to license the

Faram Trademarks.  According to Defendants, Old Faram had already transferred ownership of

the Faram Trademarks to FGM through the TSA.  (*See* Defs.' Mem. 16–17; *see also* Guzzardi

Aff. Ex. 7.)  Thus, the validity of the 2014 Distributorship Agreement depends on whether the

TSA successfully transferred ownership of the Faram Trademarks to FGM, which in turn raises

genuine disputes of material fact.  Because it is unclear whether Old Faram even had the

authority to enter into this agreement, Defendants' motion for summary judgment requesting a

declaration that they have the right to use the Faram Trademarks under the 2014 Distributorship

Agreement is DENIED, and Plaintiff's motion for summary judgment on this issue is also

DENIED.

C.    *Abandonment*

1.  **Applicable Law**

Even where an owner acquires a valid and protected trademark, the owner will be found to have abandoned this trademark if the owner "ceases to use a mark without an intent to resume use in the reasonably foreseeable future." *ITC*, 482 F.3d at 147; *see also Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 328 (S.D.N.Y. 2011) ("A mark shall be deemed to be 'abandoned' . . . [w]hen its use has been discontinued with intent not to resume such use." (quoting 15 U.S.C. § 1127)).  After a mark has been abandoned, the mark "returns to the public domain and may, in principle, be appropriated for use by other actors in the marketplace." *ITC*, 482 F.3d at 147.

The party asserting abandonment bears the burden of demonstrating that the other party (1) discontinued use of the trademark and (2) has no intent to resume its use in the "reasonably foreseeable future." *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers*, 894 F. Supp. 2d 288, 317 (S.D.N.Y. 2012).  According to the Lanham Act, "[n]onuse for 3 consecutive years shall be prima facie evidence of abandonment." 15 U.S.C. § 1127.

A trademark's owner may rebut the presumption of abandonment by "showing reasonable grounds for the suspension" and evidencing "plans to resume use in the reasonably foreseeable future when the conditions requiring suspension abate." *Silverman v. CBS Inc.*, 870 F.2d 40, 47 (2d Cir. 1989); *see also Citigroup Inc. v. City Holding Co.*, No. 99 Civ. 10115(RWS), 2003 WL 282202, at *17 (S.D.N.Y. Feb. 10, 2003) ("[T]he presumption of abandonment applies, and it is [the owner's] burden to rebut this presumption with evidence of a reasonable business explanation for the cessation and evidence of an intent to resume use.").  The ultimate burden, however, lies with the party asserting abandonment, and "requires clear and

convincing evidence of intent to abandon." *Fifth Ave. of Long Island Realty Assocs. v. Caruso Mgmt. Co.*, 718 F. Supp. 2d 292, 306 (E.D.N.Y 2010).

## 2. Application

Defendants move for summary judgment as to their ownership of the Faram Trademarks on the ground that Plaintiff abandoned the marks. Defendants request that I declare that Plaintiff abandoned the Faram Trademarks because Plaintiff has not used them in commerce in the United States since September 2013. (*See* Defs.' Mem. 19–20.)

Plaintiff's failure to use the Faram Trademarks has not persisted for a period of three years. Plaintiff could have only become the "owner" of the trademarks when the Valle Order assigned Old Faram's assets to Plaintiff, Plaintiff became the owner of the Faram Trademarks, at the earliest, on August 11, 2014. There is also evidence that Plaintiff has used the Faram Trademarks since that time—invoices show that Plaintiff sold its furniture to customers in Florida and New York in October 2016 and February 2017, respectively. (*See* Adonia Decl. Ex. A.)[24] The period between August 2014 and October 2016 is less than three years, and thus the rebuttable presumption does not apply.

Further, Plaintiff has shown that it intends to use the Faram Trademarks in the future. Maurizio Adonia, the president of Faram 1957, declared that Plaintiff "intends to file new Section 71 Affidavits for the Faram Marks within the time frame permitted by the USPTO," signaling Plaintiff's intent to continue using the Faram Trademarks in the United States. (Adonia Decl. ¶ 5.)

Because there is sufficient evidence that Plaintiff has used the Faram Trademarks and

---

[24] "Adonia Decl." refers to the Declaration of Maurizio Adonia in Opposition to Defendants' Motion for Partial Summary Judgment, filed February 24, 2017. (Doc. 79.)

intends to use them in the future, Defendants have not met their burden of establishing abandonment by clear and convincing evidence. Thus, Defendants' motion for summary judgment as to this issue is DENIED.

**V.**     <u>**Conclusion**</u>

For the foregoing reasons, Defendants' motion for partial summary judgment is DENIED in its entirety. There are genuine issues of material fact as to the validity of the TSA, the 2014 Distributorship Agreement, and the issue of abandonment. With respect to the 2012 Distributorship Agreement, I find that the terms of the contract preclude transfer or assignment of rights; therefore, Defendants' motion for summary judgment requesting a declaration that they had the right to use the Faram Trademarks pursuant to the 2012 Distributorship Agreement is DENIED, and Plaintiff's motion for summary judgment on this issue is GRANTED.

Plaintiff's motion for partial summary judgment is DENIED IN PART and GRANTED IN PART. Plaintiff's motion for summary judgment with respect to its ownership of the Faram Trademarks, as well as with respect to the TSA and 2014 Distributorship Agreement, are DENIED, as there are genuine issues of material fact as to its ownership of the Faram Trademarks and the validity of Defendants' use of the trademarks pursuant to the agreements.

The Clerk of Court is respectfully requested to terminate the pending motions. (Docs. 53, 63.) As there are genuine disputes of material fact as to the ownership of the Faram Trademarks and the validity of the TSA and 2014 Distributorship Agreement, the parties are directed to appear for a post-discovery conference on April 4, 2018 at 10:30 a.m. in Courtroom 518 of Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York.

The parties are further directed to submit a joint letter on or before March 28, 2018, setting forth

proposed trial dates and anticipated length of trial.

SO ORDERED.

Dated: March 19, 2018
      New York, New York

Vernon S. Broderick
United States District Judge